Lela S. Wier v. Commissioner.
Wier v. Commissioner
Docket No. 87375.
United States Tax Court
T.C. Memo 1965-241; 1965 Tax Ct. Memo LEXIS 89; 24 T.C.M. (CCH) 1232; T.C.M. (RIA) 65241; September 2, 1965
deQuincy V. Sutton, for the petitioner. Ford P. Mitchell, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1955 and 1956 in the amounts of $8,903.65 and *90 $3,947.45, respectively. The deficiency for the year 1955 resulted in part from the disallowance of a claimed net operating loss carryback from the year 1956 which had previously been tentatively allowed. For the year 1956 respondent also determined an addition to the tax in the amount of $986.86 for petitioner's failure to file her return within the time prescribed by law. The issues for decision are: (1) Whether losses sustained by petitioner in connection with uranium mining leases were losses incurred in the year 1956 in carrying on a trade or business so as to be deductible in full in computing adjusted gross income for that year and result in a net operating loss carryback to the year 1955, or whether any loss sustained by petitioner in 1956 with respect to such mining leases was a capital loss deductible only to the extent of $1,000 in that year. (2) Whether respondent properly disallowed a portion of the automobile expenses and depreciation claimed by petitioner for each of the years 1955 and 1956. (3) Whether petitioner is liable for the additions to tax under the provisions of section 6651(a) of the Internal Revenue Code of 1954 for failure *91 to file her return within the time prescribed by law. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, an individual residing in Jackson, Mississippi, filed her Federal income tax returns for the calendar years 1955 and 1956 with the district director of internal revenue at Jackson, Mississippi. Her return for the calendar year 1955 was filed within the period of an extension of time granted to her for filing such return. Petitioner's return for 1956 was filed on October 15, 1957. Petitioner, during each of the years 1955 and 1956 and for some years prior thereto, operated a retail mail order drug business in Jackson, Mississippi under the name of Wonda Products Company as a sole proprietorship. During 1955 and 1956 petitioner had approximately 28 full-time employees in connection with her mail order drug business. Petitioner's brother, Joseph P. Smith (hereinafter referred to as Smith), was an employee of Wonda Products and was paid a salary for his work in connection with that business and other work he did in connection with petitioner's financial affairs. For the year 1955 the total amount paid as salary to Smith by petitioner *92 was $20,000. The total amount of this salary was paid by checks drawn on the Wonda Products Company's bank account which checks carried the notation "Salary." Sometime in the summer of 1954 and prior to August 25 of that year, Smith became interested in uranium. He had found some claims that he considered very good and he discussed these claims with petitioner. At that time petitioner and Smith arrived at some verbal understanding that petitioner would advance to Smith money to be used in connection with acquiring, developing, and working certain uranium claims. There was no formal written agreement entered into between them in this regard. On August 25, 1954, Blue Chip Uranium Corporation (hereinafter referred to as Blue Chip) was organized under the laws of the State of Colorado. Smith was president and majority stockholder. Smith owned most of the stock and some of it was owned by other members of Smith's family, but petitioner never owned any of the stock of Blue Chip. Blue Chip's office was in Denver, Colorado. On November 1, 1954, an agreement was entered into between J. E. Young and Smith, whereby Young leased to Smith 69 unpatented mining claims located in 3 separate *93 areas of the State of Utah. The claims were located on property owned by the United States. The lease was for a 5-year period subject to renewal and contained provisions with respect to operation of the leases by Smith, the lessee, and for payment of royalties to the lessor, Young. The lease agreement between Young and Smith with respect to the 69 mining claims provided for the commencement of drilling of test holes on some of the claims on or before January 30, 1955, and for drilling on additional claims at various times thereafter. This lease contained the further provision: FOURTEENTH: It is understood that Operator [Smith] has a corporation organized for the purpose of operating this property. Operator may assign this lease as a whole to such corporation; but if the operator or such corporation desire otherwise to assign or sublet the demised premises, or any interest therein Operator must first obtain the written consent of Lessors thereto. This lease was acquired from Smith by Blue Chip on or about December 5, 1954. On July 2, 1955, Smith entered into an agreement with Vincent E. Lake for the purchase by Smith of options with respect to 48 mining claims known as the Jimbo-Bob, *94 Jimbo and Inland Group of claims, with the exception of 6 such claims known as the Topaz claims. The consideration to pass from Smith to Lake for these options was $15,000 cash and 25,000 shares of Smith's personal stock in Blue Chip. Seven hundred and fifty dollars of the amount was to be paid on the signing of the agreement, $1,750 on or before July 20, 1955, and the remaining $12,500 and the assignment of the stock on or before September 15, 1955. Under this agreement Smith further agreed to pay any and all costs which may have been incurred by a contract between Lake and another calling for certain drilling and coring to be performed on the 48 mining claims. Commencing in January 1955 petitioner drew certain checks to Smith in varying amounts ranging from as low as $50 to $5,000. The total of such checks drawn by petitioner during the period from January 17, 1955, through October 14, 1955, was $32,180. Some of these checks carried a notation thereon, "For Blue Chip," some carried a notation "Travel," one $1,000 check carried a notation "Loan," another, "Reimbursement," and a $250 check issued May 9, 1955, carried a notation "Ruth Andersen Shares." The total amount of such checks *95 issued between October 1 and 14, 1955, was $3,700. Included in the $3,700 were a check issued October 11, 1955 for $300 and a check issued October 12, 1955 in the amount of $100, each of which carried the notation "Travel," and a check issued October 14, 1955 for $2,500 with the notation, "For Blue Chip." Petitioner, during 1955, issued checks to Blue Chip in the total amount of $12,040. All of these checks except five were issued prior to October 1, 1955. Of the remaining five checks, one in the amount of $1,750 was issued on October 3, one in the amount of $875 was issued on October 14, one in the amount of $200 was issued on October 19, one in the amount of $500 was issued on October 22, and one in the amount of $475 was issued on October 27. All of the funds advanced by petitioner to Smith and to Blue Chip in 1955 by these checks were used by Blue Chip in payment of various expenses incurred by it in its operations with the exception that some of the checks issued in or subsequent to July 1955 were used in payment of the $15,000 to Vincent E. Lake called for by the agreement between Lake and Smith of July 2, 1955. In 1955 petitioner issued checks in a total amount of $750 *96 to Merchants and Farmers Bank, Weatherford, Texas, the notation on the checks being either "Wier and Smith Note" or "Note." The last of such checks was dated June 24, 1955. On January 18, 1955, petitioner issued a check in the amount of $505.29 to the First National Bank, Grand Junction, Colorado, and on November 23, 1955, issued a check for $752.50 to that same bank. This latter check was in payment on a note which Blue Chip had given to the First National Bank, Grand Junction, Colorado to finance the purchase of a core drilling rig. Blue Chip had purchased this rig on or about May 7, 1955, at a cost of $15,302.25 with a down payment of $1,116.80, leaving a balance of $14,185.45 which it financed through the First National Bank, Grand Junction, Colorado. Thereafter Blue Chip made monthly payments for the months of June, July, and August to the First National Bank, Grand Junction, Colorado, in the amount of $752.50 each. The balance due the bank on this rig in October 1955 was $9,557.52. On September 22, 1955, petitioner borrowed from Victor L. Phillips the amount of $7,000 which was the source of a portion of the money she advanced either to Smith for the use of Blue Chip or to *97 Blue Chip during 1955. During the months of March through November 1956 petitioner repaid the $7,000 she had borrowed from Phillips with $277.48 interest. During the year 1955 Smith spent a large portion of his time in Colorado or Utah in connection with the business of Blue Chip. He also did some traveling in connection with Blue Chip's business. Smith was not a trained geologist or trained in the mining business but Blue Chip did hire a trained geologist and engineer. Smith advanced money of his own to Blue Chip in addition to the money which he advanced to Blue Chip from the checks issued to him by petitioner during the year 1955. During the year 1955 while Smith was spending a substantial portion of his time in Colorado and Utah, petitioner went on a number of trips to Colorado and Utah and was informed about the work being done by Blue Chip. She went out to the location of the mining claims on which Blue Chip was performing some operations. On some of the visits she actually went down the shaft into the mine. Sometimes she went on these trips alone and sometimes was accompanied by her secretary, and on at least one occasion was accompanied by her attorney. On one of her trips *98 to Denver petitioner discussed the financial affairs of Blue Chip with a bank official. Most of petitioner's trips to Colorado or Utah were over weekends since her retail drug business required substantially her full time from Monday through Friday each week during 1955. In the fall of 1955 Smith became ill and was confined to the hospital. He was unable to continue working and his condition was sufficiently serious that his recovery was uncertain. On the advice of petitioner's attorney, who was of the opinion that if the leases were further developed and operated they might prove profitable and because of Smith's physical condition being such that he could no longer actively participate in Blue Chip's affairs, the 69 leases which had been assigned by Smith to Blue Chip on December 5, 1954, were assigned by Blue Chip to petitioner on October 1, 1955. This assignment contained the following provision: NOW, Mrs. Lela S. Wier hereby assumes all delay rentals and other obligations created under said lease from J. E. Young and the said Mrs. Lela S. Wier does hereby assume the balance due the First National Bank, Grand Junction, Colorado, under a note made to said bank by the Blue Chip *99 Uranium Corporation, the balance due on said note is about NINE THOUSAND FIVE HUNDRED FIFTY SEVEN AND 52/100 DOLLARS ($9,557.52) plus interest. Under date of October 14, 1955, a purchase agreement was entered into between Smith and petitioner whereby Smith sold and assigned his entire right, title, and interest to the 48 Jimbo-Bob, Jimbo and Inland Group of claims less the 6 claims known as the Topaz claims to petitioner. Blue Chip continued in operation throughout the year 1955, and its office in Denver, Colorado was not closed until sometime in 1956. After October 14, 1955, petitioner made several trips to Colorado. Any expenses incurred with respect to operations on the leases assigned to petitioner on October 1, 1955, were paid by Blue Chip after the date of the assignment. In December 1955, a United States Treasury Department Form 941, "Employer's Quarterly Federal Tax Return" covering the months of April, May, and June 1955 in the name of Blue Chip Uranium Corporation as employer was prepared in pencil form by an accountant named Erner, who did bookkeeping and accounting for Blue Chip, and forwarded to petitioner's Jackson office where an original was typed and forwarded *100 with petitioner's check to the Internal Revenue Service in payment of the amount shown thereon to be due. In January 1956 a similar form showing Blue Chip as the employer for the months of October, November, and December 1955 was prepared in petitioner's Jackson office and forwarded with petitioner's check to the district director of internal revenue. During 1955 and 1956 petitioner made the following payments to Erner with the notations on these checks as indicated: Date of
check
Amount
Notation
Nov. 14, 1955
$ 25.00
Travel
Dec. 17, 1955
103.10
Retainer Fee, November
Dec. 17, 1955
100.00
Retainer Fee, December
Jan. 3, 1956
200.00
Legal
Petitioner in 1956 issued checks to Smith in the total amount of $1,417.67, some of which carried the notation "Expense," one of which carried the notation "Travel," and one of which carried the notation "Advance." In 1956 petitioner issued checks to the Merchants and Farmers Bank, Weatherford, Texas, in the total amount of $966.15, all of which bore a notation indicating payment of either principal or interest on a note and in 1956 petitioner issued five checks, each in the amount of $752.50 for a total amount *101 of $3,762.50, to the First National Bank, Grand Junction, Colorado, all of such checks except one dated January 4, 1956, bearing the notation "Blue Chip Note." In the fall of 1956 petitioner was unable to meet certain option payments about to become due with respect to the claims assigned to her in October 1955 or the payments due the bank on the rig. Because of this situation petitioner assigned certain of the claims to Kenneth Payne upon his agreement to meet the option payments and attempt to operate the claims. Petitioner received no money payment for this assignment but retained a right to receive one-eighth of the receipts for ore mined commencing after reimbursement to Payne of amounts he had expended. At the time petitioner entered into the agreement with Payne the bank had foreclosed its lien on the core drilling rig. However, petitioner did not know this fact at the time she entered into the agreement with Payne. Petitioner, at the time of the trial of this case, had not received any amount under her agreement with Payne. On June 14, 1955, Blue Chip filed an annual report with the Secretary of State of Colorado, listing its officers and directors, office location, person *102 in charge of its books, authorized stock and par value thereof, indebtedness as of February 28, 1955, of $16,853.22, and a balance sheet as of that date. The balance sheet in this annual report showed the following: ASSETS
Cash
$ 453.46
Mining leases and claims
392,495.00
Royalties receivable
6,900.00
Total Current Assets
$399,848.46
FIXED ASSETS: Mining equipment
$ 778.77
778.77
Deferred Charges: Exploration and Organization Expense
15,015.27
Travel advance
900.00
Total Deferred Charges
15,915.27
TOTAL ASSETS
$416,542.50
Liabilities and Capital
Accounts payable
$ 647.51
Notes payable (due officers)
7,300.00
Accrued salaries payable (officers)
8,949.99
Total Liabilities
$ 16,897.50
Capital and Surplus: Capital stock issued (4,025,000 shares)
$ 40,250.00
Capital surplus
359,395.00
Total Capital and Surplus
399,645.00
TOTAL LIABILITIES, CAPITAL AND SURPLUS
$416,542.50
On September 23, 1957, Blue Chip was declared by the Secretary of State of Colorado "Defunct and Inoperative for failure to pay the State Annual Corporation License Tax or to file Annual Reports" in the office of the Secretary of State. During *103 the years 1955 and 1956 the amounts of petitioner's advances to Smith and Blue Chip and any other payments connected with the mining claims and leases were entered on petitioner's books and accounts which she maintained in Jackson, Mississippi in an investment account. These books were not produced at the trial since petitioner was unable to locate them. These books had been turned over to a trustee in bankruptcy subsequent to the filing of the petition in this case. No reference is made on petitioner's 1955 income tax return to any expenditures in connection with mining leases or operations. On this return a net profit from the retail drug business under the name of Wonda Products Company of $28,004.57 was reported and a capital loss of $1,000 from a nonbusiness bad debt from Fort Worth Exploration in the amount of $1,250 was deducted leaving an adjusted gross income of $27,004.57. Petitioner on her 1956 income tax return reported a net loss of $40,118.72 which was arrived at by deducting from a net profit of $17,042.31 from the retail drug business a total amount of $57,161.03 which was shown on the return to consist of the following: Travel Expense to Boaz, Utah - re-
mining claim
$ 4,217.44
Loss on Purchase Mining Claims
Purchase 99 Claims - Blue Chip
Mining Co.
9,900.00
Cost Development
43,043.59
Loss on claims dropped 1956 - Un-
productive
$57,161.03
*104 Petitioner's 1956 return was prepared sometime during the year 1957 by a certified public accountant who concluded that the $57,161.03 should properly be transferred from the investment account to a business operation account and taken as a net operating loss with a resulting net operating loss carryback. A net operating loss carryback in the amount of $40,118.72 to the year 1955 was claimed by petitioner and tentatively allowed, resulting in a refund to petitioner of all taxes for the year 1955 which she had previously paid. Respondent in his notice of deficiency determined that petitioner did not sustain a net operating loss during the taxable year ended December 31, 1956, and was not entitled to a net operating loss deduction in the taxable year ended December 31, 1955, as a result of a net operating loss carryback from the taxable year ended December 31, 1956. Respondent further determined that of the amount of automobile expense of $1,980.13 deducted by petitioner in the year 1955, $300 represented an amount allocable to personal expense and that of the automobile depreciation claimed of $1,148.22, the amount of $287.06 was not properly deductible. For the year 1956 respondent *105 similarly disallowed $300 of the claimed automobile expense of $3,517.43 and $287.06 of the claimed depreciation of $1,148.22. Respondent for the year 1956 allowed petitioner a capital loss of $1,000 with the following explanation: * * * It is determined that any loss sustained by you in the taxable year ended December 31, 1956 in connection with the Blue Chip Uranium Corporation and Joseph Smith is a short-term capital loss deductible to the extent of $1,000 under section 1211 of the Internal Revenue Code of 1954. Therefore, the amount of $57,161.03 claimed by you as an ordinary loss is disallowed and you have been allowed a short-term capital loss of $1,000.00. Sections 165, 166 and 1211 of the Internal Revenue Code of 1954. Respondent further determined that for the year 1956 there was an addition to the tax due from petitioner for failure to file her return on the date prescribed by law under the provisions of section 6651 of the Internal Revenue Code of 1954. Opinion Petitioner takes the position that the expenditures made by her in 1955 and 1956 in connection with the mining leases and claims which *106 were assigned to her in October 1955, resulted in a loss to her in 1956 from a trade or business which she properly offset against her income from the retail drug business in 1956 with a resultant net operating loss carryback to 1955. It is apparently petitioner's position that from the beginning of 1955 she was in the trade or business of operating mining leases through her brother as an agent and that her brother merely used Blue Chip as a convenience. In effect, this argument would require the overlooking of the corporate entity of Blue Chip and the assumption that its activities were in reality petitioner's activities through the agency of her brother. Petitioner takes the further position that after the assignment of the claims in October 1955 she personally operated these mining claims. Even if we accept petitioner's contention that her brother, Smith, was her agent, the evidence falls far short of establishing petitioner's contention. Smith was the main officer of Blue Chip and the record shows that Blue Chip as a corporation had employees, made purchases, and filed certain returns with the Federal Government and an annual report with the State of Colorado. There is no evidence *107 in the record showing Blue Chip to be merely a dummy without substance and such evidence as is in the record shows Blue Chip to be an active operating corporation until at least sometime in 1956. On the basis of the facts in this record we hold that petitioner has failed to show that Blue Chip was not a corporate entity distinct from its officers and stockholders. The evidence in the record is very sketchy as to the arrangement between Smith and petitioner. In fact, Smith specifically testified that up until October 1, 1955, Blue Chip owned the leases and prospected for uranium, [1] and that the funds received from petitioner were used in this operation by Blue Chip. While the evidence is not as clear as to Blue Chip's operations after October 1955, the available evidence indicates that Blue Chip as a corporation continued whatever operations were carried on with respect to the leases which had been assigned to petitioner. There is no evidence in the record to indicate that any activities were ever carried on wich respect to the 48 claims of the Jimbo-Bob, Jimbo and Inland Group of claims assigned by Smith to petitioner on October 14, 1955. [2]
*108 Petitioner has likewise totally failed to prove that the amounts expended in connection with Blue Chip in 1955 should properly be considered in determining a loss from a trade or business in 1956 as distinguished from a loss from a worthless investment or bad debt. Petitioner makes reference to section 615 of the Internal Revenue Code of 1954[3] without explaining how in her view this section operates to result in her incurring a trade or business loss in 1956. Petitioner makes some vague reference to deferred expenses. However, there is no showing that for Federal income tax purposes either petitioner or Blue Chip ever made any election to defer expenses. [4] The only mention of deferred charges in the record is the reference in the annual report filed by Blue Chip with the State of Colorado on June 14, 1955, which under "Fixed Assets" on the balance sheet as of February 28, 1955, shows deferred charges for "Exploration and Organization expense $15,015.27." Cf. Royal W. Irwin, 37 B.T.A. 51, 54, (1938) in which we held a business loss to be incurred upon termination of a lease by a taxpayer engaged in the mining business to the extent that development *109 expenditures in the current and previous years were not deductible under the law and regulations then in effect since no commercial production was ever achieved.
*110 Of the total amount shown to be expended by petitioner, only a little over $6,000 was expended in 1956. Of this amount, the indication is that $966.15 was a payment of principal and interest on a note, apparently of Smith to the Merchants and Farmers National Bank, Weatherford, Texas. The inference from the record is that the proceeds of this note had been used in Blue Chip's operations in 1955. In 1956 petitioner expended $3,762.50 in payment on Blue Chip's note to the First National Bank, Grand Junction, Colorado. This note was given to finance the purchase of equipment by Blue Chip and it would appear that these payments would not constitute deductible expenses in 1956. The balance of the 1956 payments shown are checks issued by petitioner to Smith for travel expenses and advances, the total being $1,417.67. The record is not at all clear as to the purpose of the travel and expenses for which these funds were used. It is not even clear that they were used in any connection with any of the uranium leases. [5] Petitioner has totally failed to prove that she sustained any loss in 1956 from a trade or business of mining or prospecting for uranium. The record does not actually show *111 whether Blue Chip had a profit or loss from its 1955 operations. If any loss from such operations might be inferred from the general testimony in the record the amount thereof is not shown. The record is even more sketchy as to Blue Chip's 1956 operations, if any. *112 The nature of petitioner's advances to Blue Chip and to Smith on behalf of Blue Chip in 1955 is not completely clear. Whether it was the intent that Smith transfer some of the Blue Chip stock to petitioner or whether the amounts were in the nature of loans is difficult to determine from the record in this case. We have concluded that petitioner made advances to Smith or Blue Chip to be used for payment on the 48 Jimbo-Bob, Jimbo and Inland Group of claims which Smith purchased from Vincent E. Lake. If the original intent in purchasing these claims was that they were being purchased for petitioner, such fact is not shown in the record. In fact, Smith's testimony with respect to assigning the claims to petitioner because of the state of his health would indicate that the original intent was not that they be assigned to petitioner. From the way the obtaining of prior leases for Blue Chip was handled, it is reasonable to infer that Smith acquired the Jimbo group of claims intending to assign these to Blue Chip. There is no showing in the record of any expenditures for development of the Jimbo-Bob, Jimbo and Inland Group of claims. Therefore, even if petitioner had shown that Smith purchased *113 these claims for her benefit in 1955, all that would be shown would be an investment by petitioner in 1955 which she assigned to another in 1956 with the reservation of some rights to participate in profits. The record is not clear why the leases which were owned by Blue Chip were transferred to petitioner. If this transfer was made in satisfaction of loans by petitioner to Blue Chip, a question might arise as to whether any difference between the value of the claims at the date of transfer to petitioner and the amount of the advances made by petitioner to or for Blue Chip might not give rise to some form of worthless debt or investment loss in the year 1955. See Whipple v. Commissioner, 373 U.S. 193, 196. There is no evidence to show the value of these claims when they were transferred to petitioner in October 1955 except statements by Smith and petitioner that they thought they had some value and were not totally worthless. The parties argue at some length with respect to what constitutes a trade or business, each party relying on Whipple v. Commissioner, supra. In our view, the facts in this record are totally insufficient to show that petitioner, at *114 any time during 1955 or 1956 in her individual capacity or through her brother as an agent, was engaged in a trade or business of prospecting for uranium or developing uranium leases. Petitioner has shown that on a number of occasions she went out to Colorado and went into some mines operated by Blue Chip and on at least one occasion made some arrangement at a bank on Blue Chip's behalf. Whether these trips were in connection with an investment she was making in a corporation, or some investment she planned to make jointly with her brother in uranium leases has not been shown. The record falls far short of showing that petitioner as distinguished from the corporation, Blue Chip, was in any trade or business connected with uranium mining. Petitioner has failed to show error in respondent's determination that in 1956 she did not sustain a loss from a trade or business from her expenditures which went into the Blue Chip operation and that she did not have a net operating loss carryback to 1955. Petitioner offered no evidence with respect to the use of her automobile in 1955 or 1956 or any explanation for the late filing of her 1956 Federal income tax return. Therefore, petitioner *115 has failed to show error in respondent's determination in these respects. Decision will be entered for respondent. Footnotes
1. Smith testified as follows with respect to receipt of petitioner's checks made to Blue Chip and to himself and the use thereof in the corporate business: Q. Those made to Blue Chip, what did you do with them, deposit them to Blue Chip account? A. Yes. Q. And those made to Joseph P. Smith, did you do the same thing? A. A great many of those were, and I am sure that most of them were made to Blue Chip, and I am sure that all those really or they would not have been in this group. Q. Those checks then were disbursed by Blue Chip in its business of prospecting for uranium. Is that correct? A. Yes. Q. And up until October 1, 1955, Blue Chip Corporation owned the leases and prospected for uranium, is that correct? A. Yes, sir. Q. The corporation? A. Yes. ↩
2. Petitioner testified as follows: Q. After you took over the lease and you become the owner of it, and it was transferred to you in October of 1955, and you stated that you went out to visit the shaft and went down the shaft, by whom or in what manner were the workers paid? Were they paid by Blue Chip, or Wonder Products, or how were they paid? A. Some of it was paid directly, I think, but I am not sure about that, but I think that Mrs. Kellog and Mrs. Smith sent some of the payrolls direct from our office; some of it was paid through Blue Chip and perhaps Uranium Ventures.↩
3. All references are to the Internal Revenue Code of 1954 unless otherwise indicated. SEC. 615. EXPLORATION EXPENDITURES. (a) In General. - In the case of expenditures paid or incurred during the taxable year for the purpose of ascertaining the existence, location, extent, or quality of any deposit of ore or other mineral, and paid or incurred before the beginning of the development stage of the mine or deposit, there shall be allowed as a deduction in computing taxable income so much of such expenditures as does not exceed $100,000. This section shall apply only with respect to the amount of such expenditures which, but for this section, would not be allowable as a deduction for the taxable year. This section shall not apply to expenditures for the acquisition or improvement of property of a character which is subject to the allowance for depreciation provided in section 167, but allowances for depreciation shall be considered, for purposes of this section, as expenditures paid or incurred. In no case shall this section apply with respect to amounts paid or incurred for the purpose of ascertaining the existence, location, extent, or quality of any deposit of oil or gas. (b) Election of Taxpayer. - If the taxpayer elects, in accordance with regulations prescribed by the Secretary or his delegate, to treat as deferred expenses any portion of the amount deductible for the taxable year under subsection (a), such portion shall not be deductible in the manner provided in subsection (a) but shall be deductible on a ratable basis as the units of produced ores or minerals discovered or explored by reason of such expenditures are sold. An election made under this subsection for any taxable year shall be binding for such year. ↩
4. Sec. 1.615-3(b)(2), Income Tax Regs., provides as follows: Sec. 1.615-3 Election to defer exploration expenditures. * * *
(2) The election shall be made for each mine or other natural deposit by a clear indication on the return or by a statement filed with the district director with whom the return was filed, not later than the time prescribed by law for filing of such return (including extensions thereof) for the taxable year to which such election is applicable.↩
5. Smith testified with respect to these checks as follows: Q. What about those that were made out to you in 1956? What did you do with those? A. It states right there practically all of them are for expense for travel. Q. I thought that you stated that you were no longer interested in Blue Chip Uranium Corporation after October, 1955, and no longer participated in the business? A. I said that I did not go back out there. I did other things for her, traveling in other places. Q. For instance, connected with Blue Chip Uranium Corporation? A. I can't recall what each item was for and where I went. Q. Do you recall doing any work for Blue Chip Uranium Corporation or in connection with Uranium in 1956, after you supposedly withdrew from the business in October 1955? A. I did not ostensibly withdraw. I was not just able to carry on properly, and they thought I was going to die, and that I had better make the assignment during my lifetime, because I could not sign them after I passed away. That was the thing to do, and I don't say that I did not do any more business or work any more in 1956, but I did not do very much. These only represent a few checks and most of them small amounts. I don't know just what I used them for and I could not say because I don't know. They were set up for travel expense and that must have been what they were for, because there would have been no point checks for any thing of the kind other than what they were set up for, travel expense.↩